UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No.    4:19-CR-272 ) ) |
| DEREK J. PETTY, | ) ) |
| Defendant. | ) ) |

**<u>DEFENDANT PETTY'S MOTION FOR *DE NOVO* REVIEW BY DISTRICT COURT OF MAGISTRATE'S ORDER DENYING TEMPORARY RELEASE BASED ON GLOBAL PANDEMIC</u>**

Defendant Derek J. Petty ("Petty"), by and through undersigned counsel, respectfully moves this Court to reconsider the Magistrate's order denying temporary release pending trial pursuant to 18 U.S.C. § 3142(i)(4), which expressly provides this Court with statutory authority to "permit the temporary release…to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Under both prongs—preparation of Petty's defense and the compelling reason of an unprecedented public health pandemic which threatens Petty's life—temporary release is warranted. Petty respectfully requests that this Court set this matter for a telephonic or videoconference hearing as soon as possible.

This is a matter of life and death. Federal prisoners are dying and will continue to die in the most significant public health pandemic in our lifetimes. At the magistrate level, the Government praised BOP on its efforts since January 2020 to "mitigate transmission." But in the nine days that have transpired since the magistrate court denied Petty's motion, BOP's data reflects that 212 *additional* inmates have tested positive for COVID-19, 42 *additional* staff have tested

1

positive for COVID-19, and 7 *additional* federal inmates have died from COVID-19:



The trend reflected in this graph will continue day after day after day. A groundbreaking expose in yesterday's *St. Louis Post-Dispatch* revealed that one of the very county jails where federal pretrial detainees in our district are housed has hidden from the public that, in March, two staff members tested positive for COVID-19 and two inmates are now experiencing symptoms consistent with COVID-19.[1]

This is a genuine humanitarian crisis and this Court should not wait for more inmates to die before releasing an inmate, like Petty, who poses no risk of flight, no danger to the community,

---

[1] https://www.stltoday.com/news/local/crime-and-courts/st-louis-county-jail-employees-tested-positive-for-covid-19-two-inmates-show-mild-symptoms/article_f3c8532c-172c-5a42-9d83-0562ae4c231e.html#tracking-source=home-top-story-1

2

who maintains his innocence (and is presumed innocent), who has a constitutional right to effective assistance of counsel, who has a history of health issues that make him particularly vulnerable to this virus, and whose trial has been continued indefinitely.

### I. Relevant Background

On April 3, 2019, a federal grand jury in the Eastern District of Missouri returned a one-count indictment alleging that Petty:

> did knowingly and intentionally combine, conspire, confederate, and agree together with each other to commit the following offense against the United States: to acquire and obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3) and punishable under Title 21, United States Code, Section 843(d)(1).

(Doc. 1).

Over Petty's objection, Petty has been ordered detained pending trial. He is in the custody of the U.S. Marshals Service and is being detained in the Macoupin County Jail in Southern Illinois.

Trial was scheduled to begin on March 16, 2020. However, Petty's trial was continued on this Court's own motion to April 13, 2020. (Doc. 106). The order continuing the trial was predicated on a determination by the Centers for Disease Control and Prevention ("CDC") "that COVID-19 presents a serious public health risk, and on March 11, 2020, the World Health Organization declared COVID-19 a pandemic." (*Id.*). This Court justified its continuance as necessary "to take precautionary measures against any potential spread of COVID-19." (*Id.*) On March 18, 2020, this Court entered a supplemental order vacating the trial date and noting that the trial would be reset at a future date. (Doc. 109).

Petty filed a motion to permit temporary release on March 17, 2020. (Doc. 108). On March 27, 2020, he filed a supplemental brief in support of the motion. (Doc. 110). On March 30, 2020,

the Government filed its response in opposition. (Doc. 111). On March 31, 2020, the magistrate judge entered an order denying Petty's motion. (Doc. 112). This Court should, on *de novo* review, overrule that decision and follow the lead of courts throughout this country granting nearly identical motions under this precise statutory mechanism.

Currently, Illinois and Missouri are experiencing COVID-19 outbreaks via community transmission and it is widely recognized by federal and state authorities that these regions—and the country as a whole—are experiencing an unprecedented health emergency with anticipated catastrophic consequences. The President of the United States has strongly encouraged everyone to avoid interactions involving more than 10 people, schools are closed, millions of residents have been ordered to shelter in place, and it is too dangerous for people to dine in a restaurant anywhere in Illinois including the very city in which Petty is being detained. In an era where social distancing is both encouraged and mandated to protect public health, it is impossible for defense counsel to meet with Petty for purposes of trial preparation without violating the CDC's recommendations and restrictions governing all people including undersigned counsel.

**II.      Release is Necessary to Permit Petty to Prepare for Trial**

Under these unprecedented circumstances, this Court should release Petty so he can assist in his own defense in preparation for trial. To give this Court context, Petty is detained in the Macoupin County Jail which has only *one* jail visitation room for attorney-client meetings. The room is small, has no window or natural ventilation, does not permit counsel and the defendant to remain an adequate distance apart to constitute social distancing as recommended by the CDC, and if the room is occupied by another attorney, counsel must wait in a public waiting area at the jail.

It is neither realistic, nor constitutional, to expect Petty to prepare for trial while detained

under these circumstances. Instead, this defendant in an alleged prescription fraud case should be released pending trial given the drastic change of circumstances since this Court denied his request for pretrial bond. Section 3142(i)(4) expressly provides this Court with the power to "permit the temporary release" of Petty where, as here, it is "necessary for preparation of the person's defense."

In a footnote in its response, the Government argues that because undersigned counsel represented to this Court that they were prepared to proceed to trial on March 2, 2020, the argument that Petty must be released to prepare for trial is "disingenuous." (Doc. 111 at fn. 3). This position by the Government turns the Sixth Amendment on its head. A criminal defendant has a constitutional right to assist in his own defense and this right does not somehow terminate when a trial is continued.

Alternatively, the Government posits that following this pandemic—it is anyone's guess as to when that might be—this Court can "simply grant a continuance if a detainee were unable to communicate with defense counsel in a timely manner." (*Id.*). The Government's position boils down to this: Petty should be detained indefinitely and, someday, he can ask to be detained longer while he prepares his defense after a lengthy hiatus from being able to communicate with his legal counsel. To accept this argument would make the Sixth Amendment right to a speedy and public trial ring hollow. That is precisely why Congress—in the very statute Petty seeks relief under—allows for temporarily release so that defendants can confer with counsel. Detaining someone even longer is an injury, *not* a remedy. Nonetheless, the magistrate accepted the Government's argument on this point. (*See* Doc. 112 at 4). This Court should respect that the Sixth Amendment right to counsel does not somehow evaporate because there is a pandemic—especially where, as here, there is a statutory mechanism Congress put into place for this very circumstance.

### III. The Global Pandemic Constitutes "Another Compelling Reason" to Permit Petty's Temporary Release Under Section 3142(i)(4)

Section 3142(i)(4) expressly provides this Court statutory authority to "permit the temporary release" of Petty pending trial upon a determination that "such release [is] necessary…for another compelling reason."

As a pretrial detainee, Petty faces the threat of coronavirus within the jail's walls and he will be particularly vulnerable when—not if—coronavirus comes to Macoupin County Jail. *See* Rich Schapiro, *Coronavirus Could 'Wreak Havoc' on U.S. Jails, Experts Warn*, NBC News (Mar. 12, 2020) ("We're in a very perilous stage right now," said Dr. Homer Venters, the former chief medical officer of the New York City jail system. "It's just a matter of time before we see cases inside jails and prisons").[2] According to public health experts, incarcerated people "are at a special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe." *See* Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020);[3] P. Leila Barghouty, *U.S. Prisons Are Not Ready for Coronavirus*, THE OUTLINE (Mar. 6, 2020);[4] *see also* Kaiser Health News, *Could Coronavirus Cause a National Prison Lockdown?*, U.S. NEWS & WORLD REPORT (Mar. 13, 2020) ("Though small by comparison, the federal system sheds light on issues many state, county and local officials are grappling with now.  Because the facilities are typically dense and crowded, they could become prime breeding grounds for the highly contagious coronavirus");[5] Chris Strohm, *Prisons' Coronavirus Risk Puts Justice Department Under Pressure*, BLOOMBERG (Mar. 12, 2020) (noting concerns that coronavirus outbreak "could spark riots"); Joshua Eaton,

---

[2] https://www.nbcnews.com/news/us-news/coronavirus-could-wreak-havoc-u-s-jails-experts-warn-n1156586
[3] https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators
[4] https://theoutline.com/post/8770/prison-coronavirus-covid-19-outbreak?zd=1&zi=oixu2i52
[5] https://www.usnews.com/news/healthiest-communities/articles/2020-03-13/could-coronavirus-cause-a-national-prison-lockdown

6

*Federal Prisons Don't Have Coronavirus Test Kits for Inmates*, ROLL CALL (Mar. 6, 2020) ("Federal prisons, whose inmates may be a high-risk population for a coronavirus outbreak, do not have kits to test for the disease available").[6]

In China, officials have confirmed coronavirus spreading at a rapid pace inside Chinese prisons, counting 500 cases. *See* Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020).[7] And Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling…[reports] that COVID-19 has spread to Iranian prisons." *See* Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020).[8] Courts across Iran—not typically considered a bastion of liberty—have granted 54,000 inmates furlough in an effort to contain coronavirus across the country. *See* Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020).[9] And many prosecutors—most recently Brooklyn District Attorney Eric Gonzalez—have sought emergency clemencies and declined to prosecute lower-level offenses in the midst of this pandemic so as not to unnecessarily incarcerate people. *See Coronavirus: Sentenced to COVID-19*, THE DAILY APPEAL (Mar. 12, 2020).[10]

As the CDC implores Americans and others throughout the world to use basic precautions such as alcohol-based hand sanitizers, jails consider following such protocols to constitute the illicit use of contraband—carrying with it punishment for inmates. These dangerous conditions

---

[6] https://www.rollcall.com/2020/03/06/federal-prisons-dont-have-coronavirus-test-kits-for-inmates/
[7] https://bit.ly/2vSzSRT
[8] https://cnn.it/2W4OpV7
[9] https://apnews.com/af98b0a38aaabedbcb059092db356697
[10] https://theappeal.com

exacerbate what is already a frightening and dire situation for the general population, and raise constitutional concerns of cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.") (citation and internal quotation marks omitted). Failure to follow CDC protocols designed to save lives constitutes deliberate indifference at its very core.

The conditions of pretrial confinement create the ideal environment for the transmission of contagious disease. Inmates cycle in and out of pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. In county jails such as the one Petty is detained, individuals charged with state crimes routinely cycle into and out of confinement from the community—a community where coronavirus has spread like wildfire and will continue to spread in what the United States Surgeon General has warned Americans will be the saddest and worst week in our lives. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in pretrial detention centers and county jails.

These considerations are being taken into account by federal judges considering detention orders. On March 12, 2020, Magistrate Judge Orenstein in the United States District Court for the Eastern District of New York decided that detaining a pretrial defendant who was using drugs while on supervision would present too great a risk to the staff and inmates at MDC Brooklyn, ruling that part of the "danger to the community" calculus had to include the risk of a new inmate bringing the virus into the facility. *United States v. Raihan*, 20 Cr. 68 (BMC) (Mar. 12, 2020) (Doc. 19).

The circumstances that existed when Petty was ordered detained have now changed. There

8

is a pandemic that poses a direct risk to Petty that is far greater if he continues to be detained during this public health crisis—which this Court has already considered is so severe that it warranted continuation of a federal jury trial on the Court's own motion. Petty is particularly vulnerable because he has a history of smoking (which impacts his lungs) and has hardware in his legs due to significant medical conditions. As of the date of this filing, COVID-19 has no vaccination, no treatment, and no cure. And why it affects certain individuals—including those who are relatively young—more than others remains a medical mystery.

Furthermore, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). One charged with a crime is, after all, presumed innocent. *See Stack v. Boyle*, 342 U.S. 1, 4 (1951). And that is more than symbolic for defendants like Petty who have already had their *Frye* hearings and who fully intend to proceed to trial. A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *See United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan, J. and Marshall, J). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted).

Regardless of the allegations in the indictment, there is no greater necessity than keeping a

9

defendant alive. And where, as here, the charge involves allegations of prescription medication fraud—as opposed to, for example, allegations of violence—there is no good reason to subject anyone to an increased risk of death while he awaits trial. Courts across the country and throughout history have recognized these realities. *See, e.g., United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

### IV. Conditions of Release Would Allow Petty to be Treated Humanely While Ameliorating any Danger to the Community or Risk of Flight

To be clear, Petty's life—not only his liberty—is on the line, creating a powerful incentive for Petty to abide by any conditions of release this Court may impose and changing the calculus that initially led to the denial of bail in this case.

During this temporary release, Petty will be supported and monitored—by location monitoring if necessary—by Pretrial Services. The nation is, for all intents and purposes, currently abiding by what this Court might consider home detention and Petty has the support of the Justine Petersen organization as reflected in testimony heard by this Court at Petty's bail hearing. Indeed, Petty's probation officer testified that he fully complied with the conditions of his release with the sole exception of the unproven allegations in this pending case in which Petty is presumed innocent and is proceeding to trial.

In its order, the magistrate notes that Petty has the burden of demonstrating, by clear and

convincing evidence, that there are conditions of release that will reasonable ensure his appearance and the safety of the community. (*See* Doc. 112 at 3). To this end, Petty expressly requested an evidentiary hearing. The magistrate's order ignores Petty's request for an opportunity to present evidence for the Court's consideration yet somehow determines that he failed to make this evidentiary showing. This Court should correct this error and set this matter for an evidentiary hearing (to be conducted by telephone or videoconference).

### V. The Government's Response Does Not Provide This Court with Any Legally Justifiable Grounds for Denying Petty's Motion

Petty's initial motion for release was filed March 17, 2020. Since then, much has changed. The United States has more reported COVID-19 cases than any other nation in the world. On the day Petty's motion was filed, Illinois (where Petty is detained) suffered its first COVID-19 death.[11] That day, Illinois documented 160 cases. *Id*. On March 26—just nine days later—Illinois health officials reported 2,538 cases and 26 deaths.[12] On March 26, Illinois reported 673 *new cases*. *Id*. And these numbers almost certainly understate the problem, as community spread has been ongoing, and all states have struggled to administer COVID-19 tests to all individuals in need of screening. While the United States has not yet performed enough tests to accurately capture the true scope of this disease within its borders, the overall trend indicates continued exponential growth with no end in sight.

At the magistrate level, the Government selectively cited a handful of cases in March where courts denied similar motions. However, this Court should follow the lion's share of cases throughout this country where courts have granted precisely this relief. *See, e.g., United States v. Chavol*, No. 20-50075 (9th Cir. Apr. 2, 2020) (stipulation in a FRAP(9) appeal to release on

---

[11] http://www.dph.illinois.gov/news/public-health-officials-announce-first-illinois-coronavirus-disease-death
[12] https://wgntv.com/news/coronavirus/covid-19-pandemic-march-26-updates/

11

conditions); *United States v. Tovar*, No. 1:19-cr-341-DCN, Dkt. No. 42 (D. Idaho Apr. 2, 2020) (releasing defendant previously detained in presumption of detention case after finding COVID-19 a compelling basis for release under § 3142(i)); *United States v. Claudio-Montes*, No. 3:10-cr-212-JAG-MDM, Dkt. No. 3374 (D.P.R. Apr. 1, 2020) ("[G]iven the COVID-19 pandemic afflicting the world, rather than issue an arrest warrant at this time, the Court will instead issue a summons[.]"); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to people in detention); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's] favor" and thus ordering release); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to people in prison); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense"); *United States v. Mclean*, No. 19-cr-380 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only

rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release"); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *Thakker v. Doll*, No. 1:20-cv-

480-JEJ (Mar. 31, 2020) (granting TRO releasing high-risk immigration detainees from custody due to the dangers of COVID-19); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *Basank v. Decker*, 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) (same).

At the Macoupin County Jail where Petty is detained, new inmates continue to be brought into the facility—which is potentially exposing Petty and the entire inmate and staff population to COVID-19.

As it stands, Petty has been in federal custody for nearly a year—and there is, unfortunately, no end in sight. While the COVID-19 pandemic is unprecedented and was impossible to predict, it simply cannot be used to justify holding Petty—who maintains his innocence to the charge against him and who is presumed innocent as a matter of law—to be held indefinitely with no trial even scheduled.

The Government's response, in large part, avoids the merits of Petty's argument. Instead, the Government focuses its analysis on 18 U.S.C. § 3142(f) which sets out when it may be appropriate to reopen a detention hearing. (*See* Doc. 111 at 6-8). This, of course, is inapposite as Petty seeks relief under Section 3142(i)(4) which provides, "[t]he judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." (*See* Docs. 108 and 110).

The Government also attempts to fault Petty for not presenting "evidence that any detainee

14

at the Macoupin County (IL) Jail has been exposed to COVID-19[.]" (Doc. 111 at 1-2). However, to be clear, undersigned counsel personally contacted the Macoupin County Jail to inquire as to whether any detainee has actually been tested for COVID-19 and was informed that no testing has been performed. A complete lack of testing cannot possibly serve as any indication that COVID-19 is, or is not, present at the facility. And, to be clear, all statistical analyses of the ongoing pandemic make clear that it is only a matter of time before the disease reaches the facility where Petty is detained—if it is not already there. Further, Petty's request for an evidentiary hearing was ignored by the magistrate.

The Government also criticizes Petty for advancing only "concerns about the spread of COVID-19 outside the jail system to justify his immediate release on bond." (*Id.* at 1). While Petty indeed highlights the remarkable rate at which this pandemic is sweeping the entire planet, his initial motion, supplemental brief, and this motion, are replete with references to articles describing the dangers faced by jails and other correctional institutions across the United States.

Applying this logic, the Government boldly argues that Petty may, in fact, be safer inside the Macoupin County Jail than he would be were he to be released to the St. Louis area. (*Id.* at 9-10). In fact, the Government boasts, "[t]hanks to BOP's efforts, despite tens of thousands of confirmed COVID-19 cases across the country, only 19 inmates in BOP custody has [sic] been diagnosed with COVID-19 as of today, with a single reported fatality." (*Id.* at 6) (citing https://www.bop.gov/coronavirus/index.jsp).

The Government filed its response on March 30, 2020. One day later, according to that same BOP website, there were 28 confirmed COVID-19 cases among BOP inmates, along with 24 staff. As of April 7, 2020, BOP reports that 241 inmates have tested positive for COVID-19,

15

along with 73 BOP staff. And now, 8 inmates have died.[13] Is the Government still advancing that argument only nine days later when 241 inmates have tested positive with eight reported fatalities—all "thanks to BOP's efforts"? Every day that Petty remains in custody increases his chances of exposure.

On March 23, 2020, the District Attorney for the City of Philadelphia, Pennsylvania issued a press release stating,

> Safely and swiftly depopulating corrections facilities is a matter of life or death for all of us, including corrections officers, health care professionals, and all corrections workers and their families; law enforcement and attorneys; incarcerated people, including those who have not been convicted of crimes; and communities at large. Safe and swift depopulation of these facilities will enable those who become ill to be treated and appropriately isolated; mitigate panic-fueled staff attrition and prisoner violence; and enable the criminal justice system to be full partners in flattening the curve, so that infections are minimized and Pennsylvanians may once again resume normal activities—something so many desperately need.[14]

A piece in The Atlantic, notes that a survey of America's 20 largest city and county jails reveals that "[s]ince March 22, jails have reported 226 inmates and 131 staff with confirmed cases of COVID-19[.]"[15]

And just yesterday, the *St. Louis Post-Dispatch* published a groundbreaking article that should trigger public outcry. Apparently, late last month—while the Government asked the magistrate judge to commend the efforts by BOP and our local county jails—two employees (including a corrections officer) at the St. Louis County Jail (where federal pretrial detainees in this district are housed) tested positive for COVID-19. Authorities have hidden this fact from the public as of the date of this filing and, according to the article, two inmates at the jail are now

---

[13] https://www.bop.gov/coronavirus/
[14] https://medium.com/philadelphia-justice/district-attorney-krasner-calls-on-philadelphia-courts-to-take-action-during-coronavirus-emergency-16f2a5f3ac71
[15] Available at: https://www.theatlantic.com/ideas/archive/2020/03/public-safety-case-more-jail-releases/609166/

experiencing symptoms consistent with COVID-19. Yet the Government continues to ask Petty and this Court to blindly trust the jails where federal pretrial detainees are held.

In its response, the Government also resorts to a slippery slope argument that "granting release here would cause a flood of similar requests at a time when the justice system is already inundated with challenges related to coronavirus outbreak." (Doc. 111 at 2). One can only hope. This is a humanitarian crisis and the notion that other pretrial detainees might seek release from custody so as to avoid dire health outcomes including death and to allow for communication with their lawyers to prepare a defense should serve as no deterrent to this Court's granting the relief Petty seeks.

The Government also expresses concern that, if released, Petty would return to his home where his co-defendant, Sierra Price, resides. Setting aside the fact that the home belongs to Petty, not Price, the Government's analysis ignores that Petty, if permitted temporary release, could seek housing that is satisfactory to this Court and Pretrial Services. This issue is far from insurmountable.

Petty is presumed innocent. He has spent nearly a year in federal custody awaiting a trial that may not be rescheduled for several months. He is especially vulnerable in a rural county jail and he has no meaningful way to consistently communicate with his legal counsel other than on a recorded phone line. That he should continue to be held under these unprecedented circumstances simply cannot be reconciled with the United States Constitution.

**VI.     Conclusion**

What is currently occurring in the world is unprecedented. If, as this Court has already determined, a public health pandemic of unparalleled proportions justifies continuation of this defendant's trial under the Speedy Trial Act, those same public health considerations warrant

17

temporary release of this defendant to permit him to prepare for his defense and to protect his health and safety—and the health and safety of the community were he to become infected and transmit the virus to others. The Bail Reform Act "favors the pretrial release of defendants." *United States v. Tapia*, 924 F. Supp. 2d 1093, 1096 (D.S.D. 2013). This Court "should resolve doubts about the propriety of release in the defendant's favor." *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962, 965 (E.D. Wis. 2008).

Petty is neither a risk of flight nor a danger to the community—and the circumstances have changed. This Court can and should enter an order temporarily releasing Petty, pursuant to 18 U.S.C. § 3142(i)(4), subject to any reasonable restrictions it sees fit.

Respectfully submitted,

**Margulis Gelfand, LLC**

 */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, #62265
IAN T. MURPHY, #68289
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
ATTORNEYS FOR DEFENDANT

**Certificate of Service**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the United States Attorney.

                                                */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, #62265
IAN T. MURPHY, #68289
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
ATTORNEYS FOR DEFENDANT